# EXHIBIT A

**IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT
IN AND FOR MARION COUNTY, FLORIDA**

REV GROUP INC. and E-ONE, INC.,

                                                       Case No.:

        Plaintiffs,

v.

RADICON COMPANY LIMITED,

_____Defendant._____/

## **COMPLAINT**

        Plaintiffs REV Group Inc. ("REV") and E-One, Inc. ("E-One"; together, "Plaintiffs") bring the following claims against Defendant Radicon Company Limited.  In support, Plaintiffs state as follows:

        1.      REV's subsidiaries are American manufacturers of specialty vehicles including ambulances, firefighting vehicles, recreational vehicles and aftermarket parts and services related to these vehicles.

        2.      REV's subsidiaries, including E-One, are amongst this country's largest providers of emergency vehicles and fire apparatus, including trucks and rescue vehicles.  REV's mission statement is "[t]o provide [] customers with vehicles they can count on when it matters most," and amongst its values is "Safety Is Life."  *See* https://revgroup.com/what-we-believe-in/.

        3.      Plaintiffs regularly contract with parts manufacturers to obtain component parts for their emergency vehicles.  In selecting their suppliers, Plaintiffs contract with parts manufacturers who represent they are capable of providing parts fit for Plaintiffs' intended use.

4.     Defendant Radicon Company Limited ("Radicon") is one of those parts manufacturers.  Radicon is a manufacturer of transmission cooling systems and engine radiators for use in commercial and recreational vehicles.

5.     Radicon's website currently touts its "unwavering commitment to excellence" and state of the art in-house testing facilities.  *See* https://www.radicon.co.th/.  Its website also touts a successful business relationship with Hyster Yale, a well-known American business in the trucking industry.

6.     In August 2022, a previous iteration of Radicon's website referenced its "stringent quality standards [that] have been recognized in the industry and have repeatedly won the Best Quality               Awards"               from               customers.               *See* https://web.archive.org/web/20201019234941/https://www.radicon.co.th/about-us.

7.     Pursuant to a February 1, 2023 Supply Agreement (the "Supply Agreement"), REV (on behalf of and for use by its subsidiary E-One) agreed to purchase, and in fact did purchase, Cooling Modules (Part Number 1131208) from Radicon.  The Supply Agreement was to last for three years.  *See* **Exhibit A**.

8.     A Cooling Module comprises both a radiator and condenser, and is used to cool an engine and transmission.

9.     Despite its promises to REV and E-One, Radicon's capabilities not only fell far short of its representations and warranties, but it repeatedly provided defective, leaking, and dangerous radiators and transmission oil cooling systems ("Cooling Systems" or "Cooling Modules") for Plaintiffs' emergency fleets, resulting in millions of dollars of losses.

10.     For instance, to date, at least 23 vehicles have been impacted in Florida by Radicon's misrepresentations and defective parts.  At least 40 additional vehicles have been damaged by Radicon's defective parts throughout the country.

11.     When a part was defective and did not perform as Radicon represented, Plaintiffs were forced to repair or replace both Radicon's defective parts, as well as other non-Radicon vehicle parts that were resultantly damaged – in some cases, vehicles needed new transmissions or repairs and replacements that took months to complete.

## JURISDICTION AND VENUE

12.     REV Group Inc. is a corporation organized under the laws of Delaware with its principal place of business at 245 S Executive Dr., Suite 100, Brookfield, Wisconsin 53005-4204.

13.     E-One, Inc. is a corporation organized under the laws of Delaware with its principal place of business at 1601 SW 37th Avenue, Ocala, Florida 34474-2827.  E-One is a wholly owned subsidiary of REV.

14.     Radicon Company Limited is located in Thailand, does not have a United States registered agent for service, and is not registered to do business in the State of Florida or any U.S. state.  However, Radicon regularly conducts business in the United States, knowingly directing sales of its parts and equipment into Florida.

15.     At all relevant times, Radicon was responsible for designing, manufacturing, assembling, producing, testing, inspecting, supplying, and distributing Cooling Systems to Plaintiffs for use in Plaintiffs' emergency and other vehicles.

16.     Radicon conducts business in the State of Florida, including but not limited to the sale of tangible property such as the Cooling Systems at issue in this case, and other engineered

vehicle parts and equipment. These activities within the State of Florida are substantial and not isolated.

17.    Radicon's Cooling Systems arrived in the United States through the Port of Tampa.

18.    At least 23 of Radicon's Cooling Systems have failed in the State of Florida, causing damage to vehicle parts and resulting in significant vehicle downtime for service, repair, or replacement.

19.    This Court is authorized to exercise personal jurisdiction over Radicon pursuant to the Florida Long-Arm Statute, Fla. Stat. §§ 48.193(1)(a)(1), (1)(a)(2), (1)(a)(6), and (1)(a)(7) because the causes of action Plaintiffs allege arise out of Radicon's:

     a.    Operating, conducting, engaging in, or carrying on a business or business venture in Florida or having an office or agency in Florida;

     b.    Committing a tortious act within Florida;

     c.    Causing injury to persons or property within Florida arising out of an act or omission committed outside Florida where, at or about the time of the injury, either (i) the Defendant was engaged in solicitation or service activities within Florida, or (ii) products, materials, or things processed, serviced, or manufactured by the Defendant anywhere were used or consumed in Florida in the ordinary course of commerce, trade, or use; and/or

     d.    Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state.

20.    Venue is proper in this Court pursuant to Fla. Stat. § 47.051 because the causes of action accrued in Marion County, Florida.

21.    All conditions precedent have been satisfied or excused.

## THE SUPPLY AGREEMENT

22.    Effective February 1, 2023, REV and Radicon entered into a three-year Supply Agreement setting forth the terms by which Radicon would supply REV with certain "Products," such as Cooling Systems, for use in both new vehicles manufactured by REV subsidiaries, and as

replacement or service parts for existing vehicles. The very first paragraph of the Supply Agreement specifies that those vehicles would include both Fire and Ambulance divisions. *See* Exhibit A.

23.    As part of this Supply Agreement, Radicon warranted its parts for two years or 30,000 miles.

24.    Radicon also contracted to provide after-market support to ensure parts availability through the entire life cycle of the vehicles, and to ensure Radicon's products would properly fit and function with the other component parts of the vehicles.

25.    Radicon also agreed to indemnify REV, including its agents and customers, against any loss, damage, liability, or cost for, amongst other things, property damage, personal injury, or recall based on defect or nonconformance of Radicon's products.

26.    The Supply Agreement requires Radicon to maintain general liability insurance with limits of not less than $3,000,000 (US) per occurrence. The Supply Agreement also mandates that, at REV's request, Radicon must provide its certificate of insurance evidencing such coverage. Failure to do so results in the voiding of the Supply Agreement, at REV's sole option.

27.    The Supply Agreement is to be enforced in accordance with the laws of Delaware.

## RADICON'S DEFECTIVE COOLING SYSTEMS IMPACT FLEETS ACROSS FLORIDA

28.    Plaintiffs sourced their Cooling Systems from a different supplier for more than a decade before engaging Radicon, but like many companies experienced during the COVID-19 pandemic, a factory shut-down required Plaintiffs to seek a different supplier-manufacturer.

29.    Through this process, Plaintiffs identified and entered into the Supply Agreement with Radicon.

30.     Plaintiffs provided Radicon with all necessary cooling data, including but not limited to the engine type and specifications that would be utilized, transmission type, mounting specifications, fan size, and how much airflow would be necessary.

31.     Radicon's "First Generation" Cooling System was defective.  Upon information and belief, the First Generation Cooling System suffered from, at least, an error in the welding or brazing process as well as the use of material that was too thin, causing the Cooling System joints to be too weak for their intended application—an application of which Radicon was fully aware prior to designing, let alone manufacturing and selling, the defective components.

32.     As soon as the Cooling Systems began to crack and leak, Plaintiffs timely notified Radicon under the applicable warranty provision.  Those systems were recalled by REV and failed at a rate of 100%.

33.     In response, Radicon developed a "Second Generation" Cooling System. The Second Generation was supposed to be better and to resolve the issues with the performance of the First Generation.

34.     The Second Generation Cooling System also leaked and suffered from multiple defects, failing at a rate of at least 26%.

35.     Radicon attempted to include "inserts" (*see* below images taken of defective Cooling Systems and broken brackets) in the Cooling System to prevent the leaks—to no avail. Plaintiffs again timely notified Radicon of the failures of its products.

36.



37.



38.     Radicon then developed a "Third Generation" Cooling System, this time increasing the material thickness in an effort to stop the leaks (an acknowledgement that the material thickness was incorrect on the two previous iterations of the Cooling System).  The third iteration of the Cooling System *still* experiences leaks.

39.     Worse still, some of the Cooling Systems sold by Radicon leaked as soon as they were removed from the packaging in which they were shipped, and even before being installed in a vehicle. Plaintiffs revoked acceptance of those Cooling Systems immediately, and they were never installed into E-One vehicles.

40.     In some instances, the Cooling System leaks caused contamination of transmission oil, resulting in ruined transmission systems on emergency vehicles, costly and lengthy repairs, damages to Plaintiffs' reputations, and downtime to fire departments and first responders who rely upon emergency vehicles for critical functions.

41.     Average service time to repair or replace defective parts, and to rebuild transmissions that were damaged beyond repair by the defective Cooling Systems, was anywhere from 2 to 14 weeks depending on replacement part availability.  E-One was further forced to purchase new Cooling Systems in the marketplace in order to replace Radicon's defective Systems.

42.     REV contracted with Radicon to supply Generation One and Generation Two Cooling Systems for its subsidiary E-One (and its customers) before it knew of the serious defects in the Radicon products.

**RADICON'S REFUSAL TO PROVIDE PROOF
OF ITS INSURANCE PER THE SUPPLY AGREEMENT**

43.     On May 8, 2024, E-One formally requested, per Section 24 of the Supply Agreement, Radicon's proof of insurance coverage.  Radicon did not respond to that request.

44.     On November 8, 2024, E-One re-iterated the request via a letter from counsel at Reed Smith LLP.

45.     E-One has yet to receive any of the required proof of insurance in response to any of these requests.

## COUNT I: BREACH OF CONTRACT

46.     Plaintiffs hereby re-allege paragraphs 1 through 45 as if fully set forth herein.

47.     Radicon breached the Supply Agreement in numerous ways, but most fundamentally by failing to provide the required functional, non-defective Cooling Systems.

48.     Radicon's repeated failure to provide non-defective Cooling Systems, failure to produce evidence of the required insurance coverage, and failure to otherwise perform under the contract resulted in breaches of at least Sections 5, 6, 8, 9, 10, 11, 12, 13, 18, and 24 of the Supply Agreement.

49.     REV and E-One's damages flow directly from Radicon's breaches, including but not limited to:  needing to take vehicles out of service; having to find and purchase replacement Cooling Systems; having to undertake multiple recalls; replacing other vehicle parts, such as transmissions; repairing damages caused by the leaking fluid from the defective Cooling Systems; the loss of customer goodwill and reputation in the industry; costs associated with retaining a technical consultant to identify the design flaw in Radicon's Cooling System; and lost profits.

WHEREFORE, REV and E-One demand judgment in their favor and against Radicon for damages for breach of the Supply Agreement, and for such other relief as the Court may deem just and proper.

## COUNT II: BREACH OF EXPRESS AND IMPLIED WARRANTIES

50.     Plaintiffs hereby re-allege paragraphs 1 through 45 as if fully set forth herein.

51.     Radicon expressly warranted that the products it sold under the Supply Agreement would be non-defective and fit for use in Plaintiffs' emergency vehicles.

52.     Radicon further represented and warranted by implication that the products it sold under the Supply Agreement would be reasonably fit for the purposes intended and be of merchantable quality.

53.     Radicon knew or had reason to believe that the particular purpose of the products it sold to REV would be for use in emergency vehicles to include fire engines, as this was made clear in the first paragraph of the Supply Agreement.

54.     The representations and warranties set forth in the preceding paragraphs formed part of the bargain for selling the products and entering into the Supply Agreement.

55.     Radicon also implicitly or impliedly warranted that its Cooling Systems were merchantable and fit for their particular and ordinary purposes.

56.     Plaintiffs relied on Radicon's representations when making the decision to enter into the Supply Agreement with Radicon.

57.     The above representations and warranties were broken and breached by Radicon, causing serious, irreparable damages to Plaintiffs and their customers.

58.     Radicon's Cooling Systems were unfit, unsafe, not merchantable, not fit for their particular purpose, and violated express and implied warranties regarding their effectiveness and roadworthiness.

59.     These breaches resulted in significant damages, including but not limited to the need to take vehicles out of service; having to seek out and purchase replacement Cooling Systems; multiple recall and needing to replace other parts, such as transmissions; damages by the leaking fluid from the Cooling Systems; loss of customer goodwill and reputation in the industry; incurred costs associated with retaining an expert to identify the design flaw in Radicon's Cooling System; and lost profits.

WHEREFORE, REV and E-One demand judgment in their favor and against Radicon for damages for breach of express and implied warranties, and for such other relief as the Court may deem just and proper.

## COUNT III: NEGLIGENCE

60.     Plaintiffs hereby re-allege paragraphs 1 through 45 as if fully set forth herein.

61.     Radicon owed a duty to REV and E-One to properly design, manufacture, assemble, produce, distribute, and/or sell, adequately test, inspect, and ensure the quality and suitability of its Cooling Systems.

62.     Radicon failed to provide functioning, non-defective Cooling Systems, and thus breached the above duties.

63.     As a result of its breach of those duties, the defective Cooling Systems Radicon provided caused property damage to other vehicle parts not purchased from Radicon that Plaintiffs were forced to repair or replace, including in some cases entire transmission systems damaged by leaking fluid from the defective Radicon Cooling Systems.  At least 23 of REV and E-One's vehicles in Florida were rendered inoperable, at least another 40 vehicles were damaged elsewhere.

64.     Radicon's breaches of the above duties actually and proximately caused damages to Plaintiffs, including but not limited to the cost of identifying and replacing the defective Cooling Systems; the cost of recalls; the cost of identifying and replacing other damaged engine parts that were damaged by Radicon's defective Cooling Systems; the cost of taking more than 20 vehicles out of commission in Florida, and additional vehicles nationwide, all resulting from damage caused by Radicon's defective Cooling Systems; lost profits; and the irreparable harm to Plaintiffs' reputation with its customers.

WHEREFORE, REV and E-One demand judgment in their favor and against Radicon for damages for negligence, and for such other relief as the Court may deem just and proper.

## COUNT IV: INDEMNITY

65.     Plaintiffs hereby re-allege paragraphs 1 through 45 as if fully set forth herein.

66.     Radicon agreed to indemnify Plaintiffs and their customers for damages and losses resulting from property damage, personal injury, or recall based on defects or nonconformance.

67.     Because Radicon's Cooling Systems leaked and were defective and generally unfit for their ordinary purposes, Plaintiffs and their end-user customers have suffered damages.

68.     To date, Plaintiffs have had to pull at least 23 vehicles from service in Florida due to the impacts of the defective Cooling Systems.

69.     Those 23 vehicles had other, non-Radicon component parts that were damaged as a result of the leaking Cooling Systems.

70.     E-One has been forced to repair or otherwise replace other components in its emergency vehicles, resulting in not only significant costs, but irreparable damage to Plaintiffs' respective industry reputations. Plaintiffs have further lost significant customer good will built up, in the case of E-One, over fifty years.

71.     Plaintiffs thus demand enforcement of Section 20 of the Supply Agreement containing the indemnification provision for all costs and damages associated with the recall and replacement of the defective Cooling Systems.

WHEREFORE, REV and E-One demand judgment in their favor and against Radicon for indemnity, and for such other relief as the Court may deem just and proper.

## COUNT V: FRAUDULENT INDUCEMENT

72.     Plaintiffs hereby re-allege paragraphs 1 through 45 as if fully set forth herein.

73.    Radicon made at least two false statements in order to induce REV and E-One to enter the Supply Agreement.

74.    Radicon represented that it had the engineering ability and testing facilities that would allow it to design a Cooling System that could function without fault in emergency vehicles. Radicon, however, knew or should have known that statement was false at the time it was made, particularly because Radicon has claimed after the myriad failures that the project timeline was "tight," and it therefore could not complete enough testing before launch.  If it knew this before the Supply Agreement was entered, it should have communicated that to Plaintiffs, but instead it touted its ability to deliver.

75.    Had Plaintiffs known that Radicon was falsely representing its capabilities, Plaintiffs would not have entered into the Supply Agreement.

76.    Radicon also represented to Plaintiffs, prior to their entering into the Supply Agreement, that it had and would maintain a minimum of $3,000,000 (US) in insurance coverage, which it knew to be false at the time of the representation.

77.    Radicon has refused to produce evidence of its contractually obligated insurance coverage, and Plaintiffs suspect Radicon does not have the required coverage.

78.    Had Plaintiffs known that Radicon would either not maintain, or not provide proof of carrying, the contractually obligated minimum insurance coverage, Plaintiffs would never have entered into the Supply Agreement.

79.    Radicon made these representations, among others, to induce Plaintiffs into the Supply Agreement.

80.    Plaintiffs acted in reliance on these representations in entering into the Supply Agreement.

- 13 -

81.    Plaintiffs' reliance on those representations resulted in significant damages, including but not limited to the need to take vehicles out of service; having to seek out and purchase replacement Cooling Systems; multiple recalls; replacing other parts, such as transmissions; damages to other vehicle parts caused by the leaking fluid from the Cooling Systems; loss of customer goodwill and reputation in the industry; costs associated with retaining an expert to identify the design flaw in Radicon's Cooling System; and lost profits.

WHEREFORE, REV and E-One demand judgment in their favor and against Radicon for damages for fraudulent inducement, and for such other relief as the Court may deem just and proper.

## COUNT VI: FRAUDULENT MISREPRESENTATION

82.    Plaintiffs hereby re-allege paragraphs 1 through 45 as if fully set forth herein.

83.    Radicon made myriad patently untrue statements to REV and E-One, or otherwise failed to disclose material facts throughout its relationship with Plaintiffs.

84.    Radicon misrepresented, knowingly, the amount of its insurance coverage, and has since concealed the true coverage despite a contractual obligation to reveal it.

85.    Radicon misrepresented the capabilities of its testing facilities.

86.    Radicon misrepresented its ability to design, test, and manufacture Cooling Systems sufficient for high performance emergency vehicles.

87.    Plaintiffs relied on these misrepresentations, purchased Radicon's Cooling Systems, placed them into vehicles or with end-user customers, and suffered damages.

WHEREFORE, REV and E-One demand judgment in their favor and against Radicon for damages for fraudulent misrepresentation, and for such other relief as the Court may deem just and proper.

Plaintiffs demand judgment against Defendant Radicon Company Limited for all damages recoverable, including damages, lost profits, loss of reputation, and attorney fees, and for any and all such further relief under Florida law as this Court deems just and proper, including interest and costs.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: February 19, 2025                    Respectfully submitted,

                                            *s/ Ana M. Barton*
                                            Ana M. Barton, Esq.
                                            FBN: 85721
                                            abarton@reedsmith.com
                                            REED SMITH LLP
                                            200 S. Biscayne Blvd.
                                            Floor 26
                                            Miami, FL 33133
                                            Telephone: 786-747-0200

# EXHIBIT A



## Supply Agreement
REV Group Inc., and Radicon Company Limited

The purpose of this Supply Agreement (the "Agreement") between REV Group, Inc., a Wisconsin corporation, 245 S. Executive Drive, Suite 100, Brookfield, WI 53005 (the "Buyer") and Radicon Company Limited, 16/1 Moo 2 Suwintawong Street, Lampakchee, Nongchok, Bangkok Thailand 10530
(the "Seller"), dated as of February 1, 2023 (the Effective Date), related to the supply of Cooling Modules for all divisions (Fire, Ambulance, Commercial, and RV) of the Rev Group, all of which are subsidiaries of Buyer.

**1. Purchase and Supply**
> From time to time, Buyer will purchase from Seller certain of the products listed on Exhibit A, as it may be amended from time to time ("Products") for use in Original Equipment Manufacturer ("OEM") production vehicles ("Production Vehicles") or to service previously sold Production Vehicles ("Service Parts"), on the terms and conditions set forth here.


**2. Term**
> This Agreement between REV Group, Inc., and Radicon Company Limited dated February 1, 2023 (the Effective Date) will be for a term of three (3) years commencing February 1, 2023 and terminating three years thereafter ("Initial Term").   This Agreement is effective as of the Effective Date and shall remain in effect until either terminated by either Party in accordance with the terms of this Agreement or expiration of the Agreement.  This Agreement may be renewed for additional one-year terms by written agreement of the parties.  If the Agreement is not renewed, but the parties continue to do business under the terms hereof, it shall be deemed extended on a month to month basis until terminated or renewed.


**3. Freight**
> The terms of delivery for all Products are listed in <u>Exhibit A.</u>

**4. Payment**
> Payment terms under this Agreement shall be net thirty (30) days for DAP Incoterm and ninety (90) days for FOB Incoterm from date of receipt of a correct invoice from Seller, or the date of receipt of the Products by Buyer. All payments shall be made in U.S. dollars.

**5. Pricing**
> a)  Seller agrees to maintain the pricing and conditions as outlined in <u>Exhibit A</u>.  The quoted prices and conditions are valid for all Buyer's subsidiaries except for logistic costs due to different address of each Buyer's subsidiaries.  In the event than one of Buyer's subsidiaries changes a design, Seller agrees to provide related documentation in order to support any changes in pricing.

> b)  <u>Pricing for Products for Production Vehicles and Service Parts</u>.  Service Parts and packaging, if applicable, shall be quoted and priced by Seller to Buyer at the equivalent pricing levels applicable to Products used for Production Vehicles if minimum order

quantity, packaging, delivery term and address are the same as Products used for Production Vehicles. For Products purchased exclusively for aftermarket parts resale, Buyer and all of its subsidiaries will be entitled to the maximum discount (inclusive of all incentives, rebates, volume discounts, and quantity breaks) available under the Seller's pricing and discount policy based upon the cumulative purchases of all Buyer's subsidiaries.

c) <u>Cost Transparency.</u>  Upon request, Seller must provide explanation satisfactory to Buyer evidencing the raw material acquisition and/or manufacturing costs, including packaging, if applicable, to Seller for all Products covered in this Agreement. Seller agrees to provide an annual written summary of the Seller's pricing and discount policies outlining all available discounts and incentives. If Seller modifies its pricing and discount policies at any time, it must provide a copy of the modified policies to the Buyer within thirty (30) days.

      i.   <u>Annual Price Reduction (APR) schedule.</u>  Seller shall make best effort to propose cost reduction ideas to be discussed and agreed with Buyer on an annual basis.

d) <u>Price Adjustment Agreement.</u>  Buyer and Seller will be entitled to price adjustments based on raw material, exchange rate, logistic cost and/or component costs related to the Products provided to the Buyer or Seller utilizing the <u>Price Adjustment Mechanism</u> set forth in Exhibit A. Buyer or Seller will present to the other the parts affected and the raw material content of the affected parts. The raw material baseline prices will be cross-referenced to the price listed in the appropriate index in Exhibit A.  Seller will be entitled (in the case of increases) or required (in the case of decreases) to adjust Product pricing upon any demonstrable cumulative increase or decrease in raw material costs of 5% or more.

## 6. Aftermarket Parts Support

a) Supplier agrees to provide aftermarket parts & support to Buyer. Supplier to ensure parts availability through the life of the vehicle as defined by REV Group. Buyer to be notified at least 60-days in advance of any plan to obsolete a part. Buyer to be given the right to make a final purchase.

b) Aftermarket parts to be offered at production vehicle pricing if commercial conditions are the same, otherwise aftermarket parts price shall be provided at production parts price plus reasonable additional costs.

c) Supplier to recommend replacement parts that should be reasonable for service replacement. d) Intentionally deleted.

e) Seller provides Buyer with relevant product information and specifications along with materials (e.g. photos) for the purpose of eCommerce.

f) Supplier to utilize Buyer' parcel and LTL accounts for shipment to Buyer' locations and direct shipment to customers, if applicable.

If Buyer ceases production of any Product or component part covered by this Agreement, Seller shall continue to maintain the tools, jigs, and fixtures at no charge to Buyer, and supply Buyer with the Products necessary to satisfy Buyer's past model service and replacement requirements for Product for a minimum of ten (10) years after cessation of production.

**7. Additional Products**

Additional Products may be added to this Agreement by written agreement of the Parties. The prices for the additional Products shall be incorporated by reference herein and added to Exhibit A.

**8. Delivery and Lead Time**

Seller agrees to a maximum of ninety (90) days' lead time for Products ordered for current Production Vehicles provided that the Buyer has given Seller a monthly forecast and usage is within 15% of forecasted volumes. If usage varies by greater than 15% of forecasted volumes, Seller agrees to use reasonably diligent efforts to continue uninterrupted supply within Buyer's lead time requirements. Seller will supply REV with updated order lead times quarterly, or within five (5) days of a substantive or anticipated change. Seller will maintain ninety-five percent (95%) on-time delivery ("OTD"), which shall be measured by full orders against stated lead times.

**9. Line Disruption** Seller will be responsible for Buyer's production line stoppage costs directly arising from Seller's untimely or failed deliveries. Buyer and Seller shall agree in good faith for line stoppage costs. Untimely and failed deliveries due to force majeure or vessel delay is not considered Seller's responsibility.

**10. Warranty**

Seller agrees as follows:
   a) Seller warrants all Products to be free from manufacturing defects for a period of two years or 30,000 miles from the date of retail delivery to the original end customer.
   b) Seller will provide the labor to remove and replace defective product within the warranty period.
   c) If the product is deemed manufacturing defective, Seller will be responsible for freight costs incurred to supply replacement Products.
   d) Intentionally deleted.
   e) Product/replacement part reimbursement from Seller is to be at current contract price.

**11. Cost Savings Initiatives**

Sellers agrees to:
   a) Actively engage in Value Analysis/Value Engineering (VA/VE) to identify additional opportunities for cost reduction of Products. Any savings resulting from mutually identified and/ or led projects are to be shared as outlined in Exhibit B.
   b) Implement lean operating concepts, create standard work and establish appropriate controls for managing and monitoring Product changes.

**12. Engineering and/or Electrical**

**Support Requirements – Seller**

**agrees to:**
   a) Complete benchmarking and testing of design ideas.
   b) Assist the Buyer with integration and design and ensure Seller's Product properly fits and functions with other component parts.
   c) Partner in providing technical assistance related to issues in new model year development, innovation, and continuity as they arise.
   d) Incorporate available technologies and technical expertise into the Products and services used and provide Buyer with advanced notice (to the extent possible) of new technology, trends, manufacturing techniques, and products, etc. prior to offering these improvements to other industry customers.

13. **Manufacturing Support
    Requirements   Seller agrees to:**

   a) Upon request, visit Buyer's production facilities as necessary to conduct line audits and
      ensure systems are working as designed.
   b) Pre-package or "kit" product components when requested.
   c) Provide troubleshooting support for manufacturing, should Buyer's associates need
      assistance throughout the assembly, installation, or testing processes.
   d) Maintain appropriate stock levels to ensure uninterrupted supply for Buyer's production
      requirements in line with the current monthly forecasts.
   e) Maintain 30% additional manufacturing capacity in order to manage fluctuations in
      demand.

14. **Special Orders/Low Volume Parts**

   Certain items that are procured from Seller are low volume items that require a material that is not
   utilized to manufacture other Products within the Seller's finished product portfolio.  Such items
   may require special or minimum raw material purchases.  In these instances, Seller will notify
   Buyer in writing that a special or minimum raw material purchase is required.  Buyer will provide
   written authorization to Seller to purchase the necessary raw materials and, in doing so, Buyer
   will commit to use the raw material through either purchasing relevant finished Products in line
   with customer demand or, in the case of finished component obsolescence, purchasing all
   remaining raw material once reasonable efforts have been made to utilize the materials elsewhere
   in Seller's production, either for other Buyer's parts or other Seller's customer parts.

15. **Keep Competitive Agreement**

   Buyer and Seller recognize that continuing to be competitive in price, performance, delivery,
   reliability, quality, and technology are essential requirements of this Agreement.  If Buyer
   reasonably demonstrates to Seller that any Product is not a competitive in price, performance,
   delivery, reliability, technology, or quality with other equivalent products of equivalent value,
   production, usage, or availability in the world, Seller agrees to provide an action plan and
   timetable within sixty (60) days or such other time period as agreed to be the parties of such
   demonstration to cure the deficiency to Buyer's satisfaction.  If the plan fails to cure the
   deficiency within the agreed upon timetable, then Buyer may at its option withdraw the non-
   competitive Product(s) from this Agreement and serve notice to terminate the obligations of the
   Parties under this Agreement with respect thereto, effective upon the date specified by Buyer in
   such notice.  Buyer agrees that prior to exercising its option, it will consider, in good faith, any
   proposal by Seller to correct the deficiency.

16. **Product Training**

   Seller agrees to provide Buyer with Product sales training highlighting the features and benefits
   that differentiate the subject Product or Products from other products in the market.

17. **Product and Technical
    Information** Upon

   request Seller agrees to:
   a) Provide Buyer service level bills of material for all systems, components, and parts
      purchased by Buyer.
   b) Provide Buyer with technical service literature, including but not limited to, any
      illustrations and trouble-shooting guides not containing proprietary or engineering
      information for all systems, components, and parts purchased by Buyer.

c) Provide Buyer with any available marketing material for systems, components, and parts purchased by Buyer for the purpose of inclusion in Buyer's marketing materials, e-commerce store, and other outlets.

**18. Obsolescence of Parts**

Seller agrees to:

a) Provide Buyer with six (6) months advance written notice of any planned obsolescence of any Products purchased by or used on Buyer products.

b) Provide Buyer with supersession and replacement information for any Products that become obsolete.

c) Offer Buyer the opportunity to make a final purchase of any Products prior to the obsolescence date.

Buyer agrees to:

a) Provide Seller with six (6) months advance written notice of any planned obsolescence of any Products purchased from Seller.

**19. Referrals to Buyer**

Seller agrees not to provide any contract product to any other party, and to refer all of Buyer's dealers and customers to Buyer for the purchase of Products to be used on Buyer's vehicles. Buyer may provide Seller with a list of its dealers and customers, which may be updated from time to time. If Seller provides any contract product to any other party, or fails to refer all of Buyer's dealers and customers to Buyer as contemplated under this provision, Seller will reimburse Buyer at the full sale price of the Product.

**20. Indemnification**

Subject to the limitations set forth below, Seller agrees to indemnify Buyer, its officers, directors, employees, controlling persons, agents and customers against any loss, damage or liability or cost of investigation for:

a) Any property damage or personal injury, whether occurring on buyer's premises, or elsewhere, caused in whole or in part directly by the action or omission of Seller or a defect in the Product, its agents, subcontractors or lower tier subcontractors. Seller will maintain appropriate insurance covering the foregoing including without limitation,; and

b) Any recall campaign based on a manufacturing defect or nonconformance caused by Seller with a State or Federal Standard by the Products, material, fabric, parts or components furnished by the Seller on this purchase order. Seller is hereby given notice that when a recall campaign is instituted, Seller will affect all repairs at its expense upon agreed by both parties. The existence of a valid recall issue will be established in accordance with applicable law and regulations and accepted industry standards.   The Seller shall establish and maintain all records and reports required by law and in case of a recall involving Products sold to Buyer, shall make such records and reports available to the Buyer.

**21. Termination**

a) **Termination for Breach.**  Either party may terminate this Agreement upon material breach or default by the other party of any of the provisions of this Agreement, which breach or default (i) is not corrected within 60 days from the date the non-breaching party gives the breaching party written notice of the breach or default; (ii) if it is not correctable within 60 days, the correction of which is not initiated within such 60-day period and thereafter diligently pursued until completed; or (iii) which is not corrected by such date mutually agreed upon by the parties in writing for remedying the breach or default.

b) **Supplier Performance Rating Process.**  The parties acknowledge and agree that Buyer may evaluate the performance of Seller from time to time, pursuant to its "Supplier

Performance Rating" process. If Seller receives a marginal or probationary rating due to an issue unrelated to price, a written corrective action with specific improvement plan must be mutually agreed by both parties. Seller's failure to successfully implement the plan in the agreed upon timeframe is grounds for termination of this Agreement.

c) **Insolvency or Bankruptcy.** Either party may terminate this Agreement upon insolvency or bankruptcy of the other party.

d) **Effect of Termination.** Termination or expiration of this Agreement shall not affect the rights of Seller or Buyer that may have accrued hereunder including, without limitation, Seller's right to receive payment for Products already delivered and Buyer's right to receive Products ordered but not delivered at the time of termination. Upon the termination and withdraw of non-competitive Product(s), Buyer will commit to purchase all obsolescence material, component parts, work-in-process parts and finished goods after reasonable efforts have been made to utilize the materials and parts elsewhere in Seller's production, either for other Buyer's parts or other Seller's customer parts.

## 22. Tooling, First Article Inspection

Unless agreed otherwise by the parties, Seller shall pay all non-recurring costs including those related to tooling, and first article inspection and/or qualification testing (both initial and any subsequent) as defined in the Engineering drawings. If Seller does not have tooling prepared, or complete first article inspection and/or qualification testing by the date established in an Order or otherwise as necessary to meet Delivery Dates, Buyer, in addition to any other remedies it may have, may terminate the Order at no cost or liabilities whatsoever.

## 23. New Business

Buyer shall negotiate with Seller in good faith with regard to placing new production business of Buyer with Seller if Seller is competitive in the areas of price, performance, delivery, reliability, technology and quality with other manufacturers of any such products. Both Buyer and Seller shall work together to develop target costs and establish the lowest possible cost of any new product. Seller agrees to provide all price/cost submissions with full cost transparency throughout the iterative design process. Seller shall also specify tooling and production lead times in the quotation. Buyer is not obligated to develop or purchase any products other than those Products covered by this agreement.

## 24. Insurance.

During the Initial Term (and Renewal Terms, if any) of this Agreement, Each Party shall maintain at its own expense Commercial General Liability Insurance, including coverage for products liability and completed operations with limits of no less than US$ 3,000,000 per occurrence and US$ 3,000,000 general aggregate for death, bodily injury, and property damage.

The minimum amounts of insurance required herein may be satisfied by Seller purchasing primary coverage in the amounts specified or by Seller buying a separate umbrella and/or excess policy together with lower limit primary underlying coverage. The structure of the coverage is at Seller's option, so long as the total amount of insurance meets Buyer's minimum requirements. Any deductibles, self-insured retentions (SIR), loss limits, and any other retentions shall be the responsibility of Seller.
Such policies shall be maintained with an insurer authorized to issue policies in the United States, which insurers shall be reasonably satisfactory to Each Party, and shall name Each Party as an additional insured with regard to the Commercial General Liability Insurance.

At Buyer's request, Seller shall provide Buyer with a certificate of insurance evidencing such coverage. Failure to provide such certificate of insurance shall void this Agreement, at Buyer's sole option.

25. **Limitation of Liability.** Under no circumstance will either party be liable to the other for indirect, incidental, consequential, special, punitive or exemplary damages.

26. **Remedies.** The rights and remedies provided herein will be cumulative and in addition to any other remedies provided by law or equity.

27. **Independent Business Entity.** Nothing contained in this Agreement is intended to create a partnership, joint venture, agency, or employer-employee relationship between Seller and Buyer. Each party is and will remain an independent contractor and neither party is liable for any debts, accounts, obligations or other liabilities of the other party, its agents or employees.

28. **Waiver.** The failure of either party to insist upon performance of any of the terms, covenants, or conditions of this Agreement shall not constitute a waiver or relinquishment of the same or of any future right to performance of such term, covenant, or condition. No waiver of any provision of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver. Any waiver under this Agreement must be in writing to be valid.

29. **Notices.** Any notice or similar communication given pursuant to this Agreement must be in writing either delivered in person, e-mail (using technology that provides evidence of receipt such as "read receipt"), transmitted by facsimile (via equipment that provides evidence of receipt), sent by certified or registered U.S. mail, return receipt requested, postage prepaid, or by next business day delivery with fees prepaid, whether public or private carrier, addressed to the respective party at the address set forth in the introductory paragraph of this Agreement or to such other address as the parties may designate in writing from time to time. All notices will be effective upon receipt.

30. **Assignment.** Neither party may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other party, which consent will not be unreasonable withheld or delayed.

31. **Force Majeure.** The parties shall be excused for delay in performance hereunder when and to the extent that performance is prevented or delayed by acts of God, fire, explosion, riots or similar natural catastrophe; or by regulation of any governmental agency or authority to the extent such regulation operates as an absolute bar to a party's performance of its obligations hereunder; (collectively "Force Majeure Events"). Any delay by either party in the performance hereunder due to a Force Majeure Event shall continue only for so long as the Force Majeure Event continues, and only to the extent that the party is so prevented or delayed.

32. **Entire Agreement; Amendments.** This Agreement, including any exhibits attached hereto, contains the complete agreement between the parties in respect of the subject matter hereof, and supersedes any and all prior agreements relating to the subject matter hereof. Except as specifically provided herein,
this Agreement may not be amended or supplemented except by an agreement in writing signed by the parties.

33. **Governing Law.** This Agreement shall be interpreted and enforced in accordance with the laws of the State of Delaware, without regard to any conflicts of law provisions.

**34. Severability.**  If any provision of this Agreement shall be declared invalid or unenforceable by a court of competent jurisdiction, the remainder of this Agreement shall remain in full force and effect to the extent it does not frustrate the purpose of the Agreement.

**35. Modification**
Any and all extensions of or modifications to this Agreement must be in the form of written amendments to this Agreement and mutually executed by authorized representative from each company.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective duly authorized officers or representatives as of the day and year first above written.

**BUYER: REV Group, Inc.**                    **SELLER: Radicon Co., Ltd.**

_____   _____        _____        01/02/2023

By:                                      Date            By: Piyawan Yawapongsiri        Date

Title: Chief Supply Chain Officer            Title: Business Development Manager

**Exhibit A**

a)  **Pricing and Conditions**

**Supplier: Radicon**

| Part/Drawing Number | Description | Rev BU | Rev Location | Rev Division | Price | MOQ | Terms | Quote Ref |
|---|---|---|---|---|---|---|---|---|
| 10000097 | Cooling Module | Capacity | Longview TX USA | Commercial | **$953.84** | 160 | FOB Bangkok | RC22-REV-0601-03 |
| 1131208 | Cooling Module | E-ONE | Ocala FL USA | Fire | **$1,098.68** | 130 | FOB Bangkok | RC22-REV-2504-02 |

- Pricing and conditions are according to Radicon design and drawing.
- Unit prices validation: valid from ETD 01-Jan-2023 to 30-Jun-2023 and subject for price adjustment mechanism.

b)  **Price Adjustment Mechanism**

- **Material and Exchange Rate**
  If material or exchange rate vary more than +/- 5% based on 6-month average rate, we will provide updated unit price based on mechanism calculations and then update the price for next effective period as shown below.

| Price Adjustment Period | 6-Month Period for Average of LME Aluminum & Exchange Rate | Radicon provides the updated pricing for approval | Effective Period **Shipments ETD Bangkok** |
|---|---|---|---|
| Period 1 | Dec-May | Jun | July-Dec |
| Period 2 | Jun-Nov | Dec | Jan-Jun |

- **Logistic Cost Review and Adjustment**
  Logistic cost is subject to change according to the most up-to-date average ocean freight rate.

**Exhibit B**

All incorporated Value Analysis/Value Engineering (VA/VE) that identify additional opportunities for cost reduction of Products resulting from mutually identified and/ or led projects are to be shared 50/50 between the Buyer and Seller.